UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ERICA I. BOLDEN,

      Plaintiff,                Civil Action No. 14-14661

        v.               District Judge MARIANNE O. BATTANI
                        Magistrate Judge R. STEVEN WHALEN

COMMISSIONER OF SOCIAL
SECURITY,

      Defendant.
_____/

## REPORT AND RECOMMENDATION

    Plaintiff Erica I. Bolden ("Plaintiff") brings this action under 42 U.S.C. §405(g) challenging a final decision of Defendant Commissioner denying her application for Disability Insurance Benefits ("DIB") under the Social Security Act. The parties have filed cross-motions for summary judgment. Both motions have been referred for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B). For the reasons discussed below, I recommend that Plaintiff's Motion for Summary Judgment be GRANTED to the extent that the case is remanded for further administrative proceedings, and that Defendant's Motion for Summary Judgment be DENIED.

## PROCEDURAL HISTORY

On September 19, 2012, Plaintiff applied for DIB, alleging disability as of August 29, 2012 (Tr. 117).  Following the initial denial of benefits, Plaintiff requested an administrative hearing, held on March 4, 2014 in Oak Park, Michigan (Tr. 38).  J. William Callahan, Administrative Law Judge ("ALJ") presided.  Plaintiff, represented by attorney Lisa Wilkinson, testified (Tr. 42-61), as did Vocational Expert ("VE") Pauline Negrum (Tr. 62-68).  On March 24, 2014, ALJ Callahan found Plaintiff not disabled (Tr. 26-34).  On November 4, 2014, the Appeals Council denied review (Tr. 1-3).  Plaintiff filed suit in this Court on December 10, 2014.

## BACKGROUND FACTS

Plaintiff, born February 13, 1976, was 38 when ALJ Callahan issued his decision (Tr. 34, 117).  She completed one year of college and received training as a medical assistant (Tr. 144).  She worked previously as a medical assistant and as a retail associate (Tr. 144).  Her application for benefits alleges disability as a result of multiple sclerosis ("MS"), hypertension, and diabetes (Tr. 143).

### A.    Plaintiff's Testimony

Plaintiff offered the following testimony.

She currently lived in Detroit, Michigan with her adult son (Tr. 42-43).  She last worked on August 28, 2012 and now supported herself with employer-sponsored long-term disability benefits (Tr. 43).  She held a driver's license and had driven herself to the hearing

-2-

but did not drive often (Tr. 43). She received medical assistant certification in 2003 (Tr. 44). She lived in a two-story dwelling with a basement (Tr. 44). Her bedroom was on the second floor (Tr. 44). Her son performed the laundry chores (Tr. 44).

Plaintiff's work as a medical assistant required her to give immunizations and write letters for doctors (Tr. 45). Currently, she did not own a computer and checked her email only occasionally (Tr. 45-46). She was previously enrolled in speech therapy but did not continue after her insurance lapsed (Tr. 46). She stopped working because her voice was not understandable (Tr. 46). Her former employer, "Henry Ford," tried without success to find her accommodated work due to her inability to answer the telephone or do verbal "authorizations" (Tr. 46).

She spent most of her time sleeping due to fatigue caused by MS (Tr. 47). Her condition was currently worse than when she stopped working in August, 2012 (Tr. 47). At present, her legs "gave out" and became "numb," and she experienced balance problems and dizziness (Tr. 47). She also experienced constant tingling in all extremities (Tr. 47). The balance problems started in the middle of August, 2012 (Tr. 47). She had not experienced any improvement since August, 2012 and with the exception of attending a church service the previous Sunday, had spent most of the previous week sleeping (Tr. 48). She reported some level of fatigue even before ceasing work in August, 2012, noting that she would spend her lunch hour sleeping rather than eating (Tr. 48-49). The fatigue increased after she stopped working (Tr. 49).

-3-

Plaintiff was diagnosed with MS after experiencing double vision and fatigue (Tr. 50). In the past, she saw her neurologist on a monthly basis but stopped six month earlier when she became uninsured (Tr. 51). Her neurological treatment was focused on "symptom management" (Tr. 52). Her MS had never gone into remission (Tr. 54). She had not been taking steroids long enough to know if they improved her condition (Tr. 54).

In response to questioning by her attorney, Plaintiff reported difficulty gripping because her arms "gave out" and became numb, adding that her right arm was weaker than the left (Tr. 55-56). She stated that she was unable to lift more than five pounds (Tr. 56). She alleged that over the course of 24 hours, she generally slept for at least 16 (Tr. 56). She was compliant with her prescribed medication (Tr. 57). She testified that she experienced memory and concentration problems following a recipe or reading a book (Tr. 57). She reported that she used a cane, prescribed by her doctor, when required to walk long distances or using stairs due to balance problems (Tr. 57-58). She stated that she was unable to stand for more than 10 minutes at a time and relied on her son to perform most of the household chores and help her in and out of the bathtub (Tr. 57-59). Plaintiff reported that in addition to the MS medication, she took medication for hypertension and diabetes (Tr. 59).

*The ALJ then resumed his questioning of Plaintiff*:

Plaintiff estimated that the purse that she was carrying weighed about five pounds (Tr. 60). The ALJ noted that the purse was "about a foot and a half by a half a foot" and was "full," stating that the purse appeared "to be at least 10 pounds" (Tr. 61). Plaintiff stated that

-4-

she carried some medical records and prescription medicine with her (Tr. 61).  She stated that as of June, 2013, she had been sleeping "all day"(Tr. 61).

B.    Medical Evidence

1. Treating Sources

In July, 2012, Plaintiff sought emergency treatment after experiencing double vision and balance problems for approximately one week (Tr. 207).   Her speech appeared normal and she was fully oriented (Tr. 207).  Treating notes state that both hypertension and diabetes were "poorly controlled" (Tr. 221).  She exhibited normal muscle tone and strength in all extremities (Tr. 208).  Angelos Katramados, M.D.  ordered an MRI of the brain and an MRA of the head and shoulders, stating that "Measures of stroke prevention will be taken" and that "Further decisions" would be made after test results were available (Tr. 208).  MRI results were consistent with "demyelinating disease"[1] (Tr. 210).  Emergency room notes state that Dr. Katramados stated that Plaintiff's symptoms were "suspicious for MS" (Tr. 225).  Her diagnosis at the time of discharge was "possible [MS]" (Tr. 227, 239).  Plaintiff again sought emergency treatment in August, 2012, reporting the MS-related symptoms of headache, double vision, and blurred vision (Tr. 240).  She also reported difficulty writing with her left hand and left arm weakness (Tr. 240).  Emergency notes state that she exhibited slurred speech, appeared "distractable," and displayed gait ataxia (Tr. 240, 250).  Notes state further

---

[1]"MS is the most common demyelinating disease." http://www.healthline.com/health/multiple-sclerosis/demyelination#Types4 (last visited February 4, 2016).

that Plaintiff had missed several appointments and had not yet started MS treatment (Tr. 240, 250). Treating records state that she exhibited lower extremity weakness and a decreased range of motion (Tr. 253). Plaintiff stated that she was "planning to move to [a] one-level apartment" to accommodate her MS-related limitation (Tr. 254). An MRI of the brain showed "new demyelinating plaques" since the earlier imaging study one month before (Tr. 256, 278). Plaintiff reported that she could attend to personal care tasks without assistance but held "onto walls and furniture at times" while walking (Tr. 257). She reported that she relied on her son to assist in cooking and cleaning (Tr. 257). She exhibited "coordination deficits" with the left side moving "slower than [the] right" (Tr. 258). Her ability to write her name in cursive was "mildly impaired" (Tr. 258). The following month, Dr. Katramados noted "difficulty walking and clumsiness" with a wide-based gait (Tr. 263). An MRI of the brain was consistent with a diagnosis of MS (Tr. 274).

In October, 2012, Silas Cardwell, M.D. noted that aside from the limitations created by MS, Plaintiff experienced "possible rotator cuff dysfunction" on the right (Tr. 262). December, 2012 treating records state that Plaintiff had not been able to return to work since August, 2012 (Tr. 260). She reported that her condition had improved, but that she experienced depression (Tr. 260). Treating records state that her right arm continued to remain weak (Tr. 260). Dr. Katramados noted that she was positive for difficulty speaking, change in vision, hip pain, memory loss, dizziness, mood changes, and slowed reflexes in the lower extremities (Tr. 260-261).

-6-

In January, 2013, a speech evaluation reviewed by Dr. Katramados, M.D. notes moderate to severe "disordered" speech (Tr. 308). Her rate of speech was deemed "slow" with accompanying breathing problems (Tr. 308). Her "short-term objective" was "normal articulation," normal voice quality, with "80 percent accuracy" (Tr. 309). In April, 2013, Dr. Katramados found that Plaintiff was "totally and permanently disabled" (Tr. 290). An MRI from the same month was mostly unchanged from a previous study (Tr. 304). Dr. Katramados noted that Plaintiff exhibited continued difficulty in speaking and changes in vision (Tr. 306). The following month, he found that Plaintiff was unable to lift or carry any weight or stand or walk for any length of time (Tr. 292). He found that Plaintiff was unable to sit for even six hours in an eight-hour workday or perform any pushing or pulling (Tr. 291-292). He found that Plaintiff was precluded from all climbing, balancing, kneeling, crouching, crawling, stooping, and all manipulative functions (Tr. 292). He found that Plaintiff experienced limitations in seeing and speaking but did not experiencing hearing limitations (Tr. 293). He found that Plaintiff should avoid all environmental hazards such as temperature extremes, dust, vibration, humidity, machinery, heights, and fumes (Tr. 294).

In July, 2013, Mirela Cerghet, M.D. noted Plaintiff's report that Copaxone improved her condition but that she experienced chronic limitations in speech and had "difficulties . . . making herself understandable" (Tr. 298). Dr. Cerghet noted that Plaintiff had begun speech therapy the previous December but had dropped out before finishing the program (Tr. 298). She reported drowsiness as a result of prescribed medication and memory problems

causing her to forget to pay bills or turn off the stove (Tr. 298). Plaintiff denied depression but stated that most of the time she felt "frustrated" (Tr. 298). She reported "blurry vision, neck pain, back pain, hip pain, leg pain, headaches, memory loss, trouble thinking, balance problem[s], dizziness, [and] weakness in [the] right arm" (Tr. 298).

Dr. Cerghet noted normal recent and remote memory but intermittent speech problems and only "fair comprehension" (Tr. 301). She noted gait abnormalities (Tr. 301). Dr. Katramados' notes from the same month state that Plaintiff continued to experience significant speech and walking problems (Tr. 302). Plaintiff noted that attending speech therapy was "very difficult and inconvenient" due to problems getting to appointments (Tr. 302). She reported that she had not been taking diabetes or hypertension medication because of financial limitations (Tr. 302). Dr. Katramados observed difficulty speaking and walking, arm and leg weakness, and balance impairment (Tr. 302). He did not observe memory loss (Tr. 303). He noted that the onset of MS had been "relatively aggressive" (Tr. 303). He expressed concern that Plaintiff had "not been yet able to obtain disability coverage," noting, "Further attestations will be given" (Tr. 303).

October, 2013 treating records note chronic "relapsing-remitting" MS (Tr. 296). Plaintiff reported that she experienced arm tingling for the past three months but was unable to afford another MRI (Tr. 297). She was referred to a low-income clinic (Tr. 297). October, 2013 treating records by Community Health and Social Services Center ("CHASS") note speech and balance difficulties (Tr. 317). January, 2014 treating notes by CHASS state that

due to financial problems, Plaintiff had not taken prescribed medications for one month (Tr.

314). The following month, she was given a referral to a neurologist (Tr. 312).

## 2. Non-Treating Sources

In January, 2013, Found Batah, M.D. performed a consultative examination on behalf

of the SSA, noting Plaintiff's report of recent steroid treatment and Copaxone injections (Tr.

283). Dr. Batah noted Plaintiff's statement that she was feeling "a little better" but continued

to experience right side weakness and "abnormal and slow" speech (Tr. 283). He noted that

Plaintiff was able to bend, squat, and walk without difficulty (Tr. 384). Dr. Batah found that

Plaintiff did not require the use of a cane (Tr. 284). He found that Plaintiff had a steady gait

and was "doing well with treatment" but had difficulty with speaking and pronunciation (Tr.

285).

## D.  Vocational Expert Testimony

VE Pauline Pegrum classified Plaintiff's past job as a photographer[2] as skilled and

exertionally light; sales clerk semiskilled/light; and medical assistant semiskilled/sedentary[3]

---

[2]Plaintiff's application for benefits does not list photographer among her former jobs, but she acknowledged the past relevant work at the hearing (Tr. 64, 144).

[3]

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. *Very Heavy* work requires "lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects

(Tr. 64-65).  She stated that her testimony would be consistent with the information found

in the *Dictionary of Occupational Titles* ("DOT") and that she would advise the ALJ of any

conflicts with DOT "and the basis of [her] opinion" (Tr. 63).  ALJ Callahan then posed the

following question to the VE, describing a hypothetical individual of Plaintiff's age,

education, and work experience with the following limitations:

> [Limited to] sedentary, able to lift or carry less than 10 pounds frequently and
> 10 pounds occasionally.  Not capable of climbing ladders, ropes or scaffolds.
> Balancing would require an assistance device like a cane.  Only incidentally
> capable of climbing ramps or stairs, stooping, kneeling, crouching or crawling.
> For communication, speaking is slow but understandable.  Environmentally,
> claimant cannot be exposed to vibrations, unprotected heights, sharp surfaces
> or objects, fast-moving heavy machinery.  But she is capable of driving.  No
> more than occasionally on the driving (Tr. 65).

The VE testified that the speaking limitation would preclude Plaintiff's past relevant

work but would allow for the sedentary, unskilled work of a clerk typist (50,000 positions

in the State of Michigan) (Tr. 66).  The VE testified that if the hypothetical limitations were

amended to include a restriction to occasional handling and fingering and the use of cane

when walking, the only job available would be surveillance system monitor which could be

performed in "office buildings, high rise apartments, and retail stores" (1,000) (Tr. 66-67).

The VE testified that if the same individual were capable of speaking at only "80 percent of

normal speed, but was capable of being understood," the individual could nonetheless

perform the surveillance system monitor positions (Tr. 67-68).  The VE testified further that

_____

weighing 50 pounds or more. § 404.1567(e).

a limitation to speaking at 50 percent of the normal speed would be work preclusive (Tr. 65).

In response to questioning by Plaintiff's attorney, the VE stated that normal work breaks

were limited to 30 minutes for lunch, one 15-minute break in the morning and afternoon, and

a "five or six" minute bathroom break each hour (Tr. 68).

### D.  The ALJ's Decision

Citing Plaintiff's medical records, ALJ Callahan found the severe impairments of

"[MS], diabetes mellitus II, hypertension and obesity"  but that none of the conditions met

or medically equaled any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr.

28).  The ALJ found that Plaintiff retained the  residual functional capacity ("RFC") for

sedentary work with the following additional limitations:

> [A]ble to lift or carry less than 10 pounds frequently and 10 pounds
> occasionally; not capable of climbing ladders, ropes or scaffolds; balancing
> would require an assistive device like a cane when walking; only incidentally
> capable of climbing ramps or stairs, stooping, kneeling, crouching, or
> crawling; the claimant is capable of only occasional handling and fingering;
> for communication capable of talking or speaking at 80 percent of normal
> speed but capable of being understood; environmentally claimant cannot be
> exposed to vibrations, unprotected heights, sharp surfaces or objects, fast
> moving machinery; she is capable of no more than occasionally . . . driving
> (Tr. 28-29).

Citing the VE's testimony, the ALJ found that while Plaintiff was unable to return to any of

her past relevant work, she could work as a surveillance system monitor (Tr. 33-34).

The ALJ discounted the allegations of disability, citing Dr. Batah's January, 2013

consultative observations that Plaintiff was able to "bend, squat and walk without any

difficulty" and did not require the use of cane (Tr. 30).  The ALJ found that while Plaintiff

was limited to "talking or speaking at 80 percent of the normal speed," she could be understood (Tr. 31). He found "no medical records" supporting Plaintiff's claim of memory and concentrational problems (Tr. 31).

The ALJ discounted Dr. Katramados' January, 2013 finding that speech problems precluded all work and his April, 2013 assessment of Plaintiff's work abilities on the basis that he "exaggerate[d] [Plaintiff's] limitations to the extreme" (Tr. 32). The ALJ noted that Dr. Katramados was not a neurologist and initially mis-diagnosed Plaintiff with a stroke (Tr. 32). He found that Dr. Katramados had "a bias in favor of an award" of benefits because Plaintiff was a former employee of Henry Ford Hospital (Tr. 32).

## STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less that a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(en banc). In determining whether the evidence is substantial, the court must "take into

-12-

account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §416.920(a). The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five  to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## ANALYSIS

-13-

Plaintiff makes four arguments in favor of remand.  First, she contends that the ALJ erred by stating that she did not meet Listing 11.09 (Multiple Sclerosis) without providing the Listing's requirements or any rationale for the finding.  *Plaintiff's Brief,* 7-9, *Docket #13*; 20 C.F.R. Part 404, Subpart P, Appendix 1 § 11.09.  She also argues that the ALJ's finding that her condition did not medically *equal* Listing 11.09 stands unsupported by any medical opinion.  *Id.*   In her second argument, she contends that the RFC composed by the ALJ was not supported by any of the medical evidence, pointing out that the sole physical assessment, performed by Dr. Katramados, directed a finding of disability.  *Id.* at 9-12.  Third, she argues that the ALJ's finding that Plaintiff was capable of speaking at 80 percent of the normal rate was unsupported by any medical evidence.  *Id.* at 13-14.  Finally, she contends, in effect, that the VE's finding that she was limited to work as a surveillance system monitor was insufficient to support the Step Five findings.  *Id.* at 14-15.  On a related note, she argues that the ALJ failed to address the conflict between the information found in the DOT and the job findings.  *Id.*

Because arguments three and four pertain to the ALJ's Step Five findings, they can be considered together.

## A.  Listing 11.09

Plaintiff takes issue with the ALJ's Step Three finding that none of her conditions met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Plaintiff's Brief* at 7-9.   Specifically, she contends that the evidence shows that she met

-14-

Listing 11.09 (Multiple Sclerosis). *Id.* She also argues that the ALJ's conclusion that she did not "medically equal" Listing 11.09A is unsupported by any medical opinion. *Id.* at 8-9. She contends that the failure to procure a medical expert opinion to determine whether her conditions equaled a listed impairment constitutes reversible error.

In response, Defendant argues that substantial evidence supports the finding that Plaintiff did not experience "significant and persistent" loss of motor function and thus, cannot establish disability under Listing 11.09A. *Defendant's Brief,* 13, *Docket #17.* Defendant also argues that Plaintiff has failed to identify any evidence to show that she *equaled* Listing 11.09 and for that reason, the ALJ was not required to procure a medical opinion on the issue of equivalency. *Id.*

At Step Three of the administrative sequence, a claimant meeting or medically equaling "the requirements of a Listed Impairment will be deemed conclusively disabled, and entitled to benefits." *Reynolds v. Commissioner of Social Security*, 424 Fed.Appx. 411, 414, 2011 WL 1228165, *2 (6th Cir. April 1, 2011); 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). "Listing of Impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments the SSA considers to be 'severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.'" *Id.* (citing 20 C.F.R. § 404.1525(a)).

A finding of disability under Listing 11.09A  requires a diagnosis of MS with:

A. "Disorganization of motor function," §  11.09A, characterized by "[s]ignificant and

persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station." § 11.04B.  Listing 11.00C states that "persistent disorganization of motor function" may take the form of "paresis or paralysis, tremor or other involuntary movements, ataxia and sensory disturbances . . ." *Id.*  Listing 11.00C states further that the motor function limitations "frequently provides the sole or partial basis for decision in cases of neurological impairment," noting that the "assessment of impairment depends on the degree of interference with locomotion and/or interference with the use of fingers, hands, and arms."

Substantial evidence supports the finding that Plaintiff did not meet Listing 11.09A. The ALJ cited Dr. Batah's finding that Plaintiff could "bend, squat, and walk without a walking aid" (Tr. 29, 284-286).  The ALJ noted that Plaintiff exhibited a steady gait with "some instability" (Tr. 29).   Plaintiff appears to concede that substantial evidence supports the finding that she has not met a listed impairment, but argues that the ALJ was nonetheless required to discuss the requirements of Listing 11.09.  *Plaintiff's Brief* at 7-8.  However, while the ALJ's Step Three determination consists of a one-sentence statement that Plaintiff did not meet a listed impairment, it is followed by a lengthy discussion of the treating and consultative records (Tr. 29-32).   The ALJ's subsequent discussion of the medical records undermining a finding of disability under Listing 11.09A is sufficient to support his finding that Plaintiff did not meet a the Listing.  *See Bledsoe v. Barnhart*, 165 Fed.Appx. 408, 411, 2006 WL 229795, at *3 (6th Cir. January 31, 2006)(contention that an ALJ must "spell out

-16-

the weight he gave to each factor" at Step Three in finding that a claimant did not meet a listing "not supported by case law").

In contrast, the ALJ's failure to procure a medical opinion on whether Plaintiff's condition medically *equaled* a listed impairment constitutes error. SSR 96-6p, states that "longstanding policy requires that the judgment of a physician (or psychologist) designated by the Commissioner on the issue of equivalence on the evidence before the administrative law judge ... must be received into the record as expert opinion evidence and given appropriate weight." SSR 96–6p, 1996 WL 374180, *3 (1996). In this case, the finding that Plaintiff did not medically equal a listed impairment was made by a Single Decision Maker ("SDM") rather than a physician and thus, did not constitute medical evidence (Tr. 70-79, 80). *See Stratton v. Astrue*, 987 F.Supp.2d 135, 147-148 (D.N.H. 2012))(reliance on the opinion of an SDM rather than a medical expert intrinsically improper); *see also Lindsey v. Commissioner of Social Sec.,* 2013 WL 6095545, *6 (E.D.Mich. November 20, 2013)(same). While the ALJ did not cite the SDM findings or otherwise indicate that he relied on them, his Step Three equivalency finding is unsupported by a medical opinion. "[T]he lack of any medical opinion on the issue of equivalence is . . . an error requiring remand." *Stratton,* at 147-148.

Defendant acknowledges that the ALJ's finding that Plaintiff did not medically equal a listed impairment is not supported by a medical opinion, but contends that she has not met the burden to show that her condition medically equaled any listed impairment. *Defendant's*

-17-

*Brief* at 14.  Defendant is correct that at Step Three, it is the claimant's "burden to prove that he has an impairment or combination of impairments listed in, or medically equal to one listed in, 20 C.F.R. Pt. 404, Subpt, P, App. 1." *Lusk v. Commissioner of Social Sec.,* 106 Fed.Appx. 405, 411, 2004 WL 1791472, 5 (6 Cir. August 6,2004). "To do so, he must present specific medical findings that his impairment meets the applicable impairment or present medical evidence that describes how his impairment is equivalent to a listed impairment." *Id.* (*citing Foster v. Halter*, 279 F.3d 348, 354 (6th Cir.2001); *Land v. Sec'y of HHS*, 814 F.2d 241, 245 (6th Cir.1986).

The ALJ's failure to procure an equivalency opinion by a medical expert is of concern.  Plaintiff's position that she is disabled as a result of MS-related symptoms, diabetes, and hypertension has remained unchanged since applying for benefits in September, 2012.   Moreover as discussed below, Dr. Katramados treating opinion, if fully credited, would direct a disability finding at Step Three.  I am troubled by the recent spate of  cases in which Defendant argues that the omission of this key procedural step of the administrative analysis amounts to at most, "harmless error."   In her current brief, Defendant goes so far as to argue that the failure to procure an equivalency position does not constitute *any* error, harmless or otherwise.  *Brief* at 9-11.  Again, given that Plaintiff has consistently alleged disability as a result of MS since applying for benefits in September, 2012,  Defendant's failure to procure an equivalency opinion between then and the March, 2014 hearing is inexplicable.  The case should therefore be remanded for reconsideration at Step III.

### B. The Treating Physician Analysis

Plaintiff argues that the ALJ erred by rejecting Dr. Katramados' disability opinions. *Plaintiff's Brief* at 9-12. She contends that the ALJ's rationale for rejecting Dr. Katramados' opinions is not supported by the record. *Id.*; 20 C.F.R. § 404.1527.

It is long established that "if the opinion of the claimant's treating physician is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, it must be given controlling weight." *Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir.2009) (internal quotation marks omitted)(*citing Wilson v. CSS*, 378 F.3d 541, 544 (6th Cir.2004); 20 C.F.R. § 404.1527(c)(2)). However, in the presence of contradicting substantial evidence, the ALJ may reject all or a portion of the treating source's findings, *see Warner v. Commissioner of Social Sec.*, 375 F.3d 387, 391-392 (6th Cir.2004), provided that he supplies "good reasons" for doing so. *Wilson*, at 547; 20 C.F.R. § 404.1527(c)(2)). In explaining the reasons for giving less than controlling weight to the treating physician opinion, the ALJ must consider (1) "the length of the ... relationship" (2) "frequency of examination," (3) "nature and extent of the treatment," (4) the "supportability of the opinion," (5) "consistency ... with the record as a whole," and, (6) "the specialization of the treating source." *Wilson*, at 544.

The failure to articulate "good reasons" for rejecting a treating physician's opinion constitutes reversible error. *Gayheart v. CSS*, 710 F.3d 365, 376 (6th Cir.2013); *Wilson,* 378 F.3d at 544–546 (6th Cir.2004)(citing § 404.1527(c)(2)). "[T]he Commissioner imposes on

-19-

its decision-makers a clear duty to 'always give good reasons in our notice of determination or decision for the weight we give [a] treating source's opinion.'" *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir.2011). "These reasons must be 'supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Gayheart*, at 376 (citing SSR 96–2p, 1996 WL 374188, *5 (1996)).

To be sure, the ALJ provided a partially acceptable rationale for rejecting Dr. Katramados' January and April, 2013 disability opinions. He cited the finding that Plaintiff's speech was "100 percent intelligible" (Tr. 32, 108). The ALJ permissibly rejected Dr. Katramados' finding that Plaintiff was disabled from all work, noting the "issue of disability" was "reserved to the Commissioner" (Tr. 32); SSR 96-5p, 1996 WL 374183, *2 (July 2, 1996). The ALJ did not err in determining that the finding of severe environment restrictions (Tr. 294) was unsupported by the treating and consultative records (Tr. 32).

However, ALJ's treating physician analysis relies, at least in part, on blatant misstatements of the records. The ALJ's conclusion that Dr. Katramados found that Plaintiff could speak at 80 percent of normal speed is nowhere to be found in the treating records (Tr. 32). In fact, Dr. Katramados noted that Plaintiff's rate of speech was distorted and "slow" with "grunts" (Tr. 308). He deemed the dysarthria "moderate to severe" (Tr. 309). The ALJ's "80 percent" finding was apparently drawn from the medical determination that Plaintiff could achieve "80 percent *accuracy*" with speech therapy (Tr. 309)(emphasis

added).  Neither the clinical findings nor the projected goals support the finding that Plaintiff was or would be capable of speaking at 80 percent of the normal rate.

Likewise, while the ALJ discounted Dr. Katramados' April, 2013 findings on the basis that Plaintiff changed physicians after losing her medical insurance, the record shows that Plaintiff saw Dr. Katramados on multiple occasions in 2012 and 2013, suggesting a well-established treating relationship at the time the disability opinions were executed (Tr. 225, 260-261, 263, 302-303, 308-309).   The ALJ's finding that Dr. Katramados' disability opinions exhibited a bias toward an award of benefits is also weakly supported (Tr. 32). While the ALJ's places great significance on Dr. Katramados' July, 2013 remark that he would continue to "pursue" an award of benefits "to the best of [his] abilities," the statement as easily suggests that Dr. Katramados sincerely believed that Plaintiff's condition entitled her to benefits and that he would continue to advocate on her behalf (Tr. 303).  And the suggestion that Dr. Katramados was biased because Plaintiff previously worked for Henry Ford Hospital is purely speculative. The ALJ also discounted Dr. Katramados' opinion of memory and concentration problems, noting elsewhere that "there [were] no medical records supporting [the] allegations" (Tr. 31). Contrary to the ALJ's finding, Dr. Cerghet noted in July, 2013 that Plaintiff's comprehension skills were only "fair" (Tr. 301).  The ALJ rejected Dr. Katramados' finding that Plaintiff had extreme lifting limitations, noting elsewhere in the opinion that she was able to carry "a rather large purse filled with paper and medications" into the hearing (Tr. 29, 60-61).  However, a "large purse," as described by the ALJ, would

-21-

be expected to include a shoulder strap; once looped over the shoulder as customarily worn, its weight would be borne by the shoulder and back muscles. The fact that Plaintiff was able to "carry" the five to ten-pound purse does not discredit her allegations of severe upper extremity limitations.

Because the ALJ's rationale for rejecting Dr. Katramados' opinions are based in significant part on an erroneous reading of the record, a remand is required. *See Wilson, supra,* 378 F.3d at 544–546 (failure to provide "good reasons" for discounting a treating physician opinion warrants remand).

### C. The Step Five Findings.

### 1. Restrictions Regarding Speech

Plaintiff revisits her argument that the ALJ's disability finding is based on the erroneous conclusion that she spoke at 80 percent of the normal speed. *Plaintiff's Brief* at 13-14. Plaintiff points out that the record lacks any support for the finding (also included in the RFC) that she could speak at 80 percent of a normal speed. *Id.* (citing 28-29). She contends that her slow speech prevents her from performing any work, citing the VE's testimony that the inability to speak at no more than 50 percent of the normal speed would preclude all competitive employment. *Id.* (*citing* Tr. 67-68).

It is well settled that the failure to include all of a claimant's relevant limitations in the hypothetical question invalidates the vocational testimony. *Ealy v. Comm'r of Soc. Sec.,* 594 F.3d 504, 516 (6th Cir. 2010); *Varley v. Commissioner of Health and Human Services,*

820 F.2d 777, 779 (6th Cir.1987); *see also Teverbaugh v. Comm'r of Soc.* Sec., 258 F.Supp.2d 702, 706 (E.D.Mich.2003) (Roberts, J) (reversible error for ALJ to rely upon VE job findings inconsistent with Plaintiff's RFC).

Here, the ALJ's original question to the VE included the modifier "slow but understandable" speech (Tr. 65). The VE later stated that the modifier of speech at 80 percent of the regular rate would not change the job findings but that the inability to speak at the rate of more than 50 percent would preclude all work (Tr. 67-68). Based on the VE's testimony, the RFC in the administrative opinion states that Plaintiff could speak at 80 percent of the normal rate (Tr. 28-29). However, as discussed above, the record does not contain any support for the conclusion that Plaintiff could speak at 80 percent of the normal rate. Dr. Katramados observed that Plaintiff's rate of speech was distorted and "slow" with "grunts" (Tr. 308). He deemed the dysarthria "moderate to severe" (Tr. 309). The "80 percent" finding was apparently drawn from the January, 2013 finding that Plaintiff could obtain "80 percent accuracy" (not speed) with speech therapy (Tr. 309). Significantly, none of the treating records suggests that Plaintiff would be able to increase her rate of speech with therapy. The ALJ's finding that Plaintiff could speak at an 80 percent rate is based on an erroneous reading of the record. Because the VE's job testimony was made in response to a modifier that did not accurately reflect Plaintiff's limitations, it does not constitute substantial evidence. *Teverbaugh*, 258 F.Supp.2d at 706. Moreover, both the treating and consultative records overwhelmingly support the conclusion that Plaintiff's rate of speech

-23-

was considerably slowed by MS; none of the evidence supports the conclusion that she could speak at 80 percent of the normal rate.   The VE's testimony that the inability to speak at more than a 50 percent rate would preclude all work (Tr. 68), makes the need for clarification and correction particularly critical.

Accordingly, the ALJ's erroneous reading of the January, 2013 records constitutes additional grounds for remand.

### 2.  The Other Step Five Arguments

Plaintiff argues further that the ALJ failed to resolve the inconsistencies between the vocational job testimony and the DOT as required by SSR 00-4p. *Plaintiff's Brief* at 15-16; SSR 00-4p 2000 WL 1898704, *4 (December 4, 2000).   She points out that the VE's testimony that she could perform the work of a surveillance system monitor, as stated by the DOT, refers to "governments service job[s]," whereas the VE testified that the position of surveillance system monitor would be performed in retail space, office buildings, or high rise apartments. *Id.* (*citing* DOT #379.367-010).

SSR 00–4p "imposes an affirmative duty on ALJs to ask VEs if the evidence that they have provided 'conflicts with the information provided in the DOT.'" *Lindsley v. Commissioner of Social Sec.,* 560 F.3d 601, 606 (6th Cir.2009)(*citing* SSR 00–4p, *4). Plaintiff's argument that the ALJ neglected to make the "conflict" inquiry is not well taken. The hearing transcript shows that the ALJ complied with the requirements of the Regulation by informing the VE if her testimony was inconsistent with the information found in the

-24-

DOT she would need to advise him (Tr. 63). The VE responded that she would advise him of any inconsistencies (Tr. 63). Having made the required inquiry, the ALJ was not obliged to do more. "'Nothing in SSR 00–4p places an affirmative duty on the ALJ to conduct an independent investigation into the testimony of witnesses to determine if they are correct.'" *Lindsley* at 606 (*citing Martin v. Comm'r of Soc. Sec.,* 170 Fed.Appx. 369, 374 (6th Cir. March 1, 2006)). Plaintiff is correct that DOT #379.367-010, cited by the VE (Surveillance System Monitor) is categorized as "government service."[4] However, consistent with the VE's testimony, the work is listed as sedentary and unskilled and otherwise appears to comport with the ALJ's hypothetical restrictions. Because the ALJ fulfilled the requirements of SSR 00-4p by asking whether the vocational testimony conflicted with the DOT and, Plaintiff has not identified a substantive conflict between the DOT and the VE's job findings, a remand on this basis is not warranted.

Likewise, Plaintiff's argument that the VE ought to have provided three occupations in her job findings rather than one (surveillance system monitor) is not well taken. Plaintiff argues that Programs Operational Manual System ("POMS"), DI 25025.005 requires ALJs to cite "at least three specific occupations" in support of a Step Five finding. *Plaintiff's Brief* at 14-15. However, as noted by Defendant, POMS DI 2500k5.005, to be applied to expedited assessments, is inapplicable here.[5] Plaintiff's contention that at Step Five the ALJ

---

[4]http://www.occupationalinfo.org/37/379367010.html (last visited February 8, 2016).

[5]https://secure.ssa.gov/poms.nsf/lnx/0425005005 (last visited February 8, 2016).

must cite at least three occupations is also unsupported by Sixth Circuit case law. *See Martin, supra,* 170 Fed.Appx. at 375, 2006 WL 509393, *5 (6th Cir. March 1, 2006)(one occupation sufficient to support the Step Five findings provided that the number of jobs amount to a "significant number"). Standing alone, the VE's testimony of 1,000 surveillance system monitor positions in existence in the regional economy constitutes a "significant number" (Tr. 67); *Martin,* at 375 (870 jobs in the claimant's geographic region a significant number).

For the reasons set forth in Sections **B.** and **C.1.,** *above,* a remand is required. However, because it cannot be said that "all essential factual issues have been resolved," a remand for further fact-finding, rather than an award of benefits, is appropriate. *Faucher v. Secretary of Health and Human Services*, 17 F.3d 171, 176 (6th Cir.1994). Upon remand, I recommend that the ALJ (1) address the errors identified in the treating physician analysis, and (2) elicit additional vocational testimony consistent with the above findings.

## CONCLUSION

For these reasons, I recommend that Plaintiff's Motion for Summary Judgment be GRANTED to the extent that the case is remanded for further administrative proceedings consistent with this Report, and that Defendant's Motion for Summary Judgment be DENIED.

Any objections to this Report and Recommendation must be filed within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR

72.1(d)(2).   Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir.  1991); *United States v. Walters,* 638 F.2d 947 (6th Cir.  1981).   Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir.  1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir.  1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within 14 days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/R. Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Date: February 10, 2016

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was sent to parties of record on February 10, 2016, electronically and/or by U.S. mail.

s/C. Ciesla

Case Manager